## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **DEBORAH NUZZI and THOMAS NUZZI,** | ) | |
| | ) | |
| | ) | **Case No. 07-CV-2239** |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **ST. GEORGE COMMUNITY CONSOLIDATED SCHOOL DISTRICT NO. 258, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

This case is before the court for ruling on various motions either seeking summary judgment or related to motions seeking summary judgment. This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, this court rules as follows: (1) the Motion for Partial Summary Judgment (#100) filed by Plaintiff Deborah Nuzzi is DENIED; (2) the Motion to Strike (#104) filed by Defendants, St. George Community Consolidated School District No. 258, Richard Reyes, William Bodemer, Sharon Thiesen, Peter Dubravec, Mark Grasso, and Darrell Pendleton, is DENIED; (3) Defendants' Motion to Strike (#106) is GRANTED; (4) Defendants' Motion for Sanctions (#110) is DENIED; (5) Defendants' Rule 56(b) Motion for Summary Judgment (#116) on Plaintiffs' claims is GRANTED; (6) Defendants' Rule 56(a) Motion for Summary Judgment (#128) on their counterclaims against Plaintiffs is GRANTED; (7) Defendants' Motion for Judgment as a Matter of Law (#135) and Motion for Leave to File (#157) are MOOT; (8) the Motions for Leave to File (#137, #171) and Motion for an Extension of Time to File (#145) filed by Plaintiffs, Deborah Nuzzi and Thomas Nuzzi, are GRANTED; and (9) Defendants' Motion to Strike and for Sanctions (#161) is

GRANTED.  Following these rulings, judgment is entered in favor of Defendants and against Plaintiffs on all claims and this case is terminated.

FACTS[1]

Plaintiffs are married to each other and are the former superintendent and former principal at St. George Community Consolidated School District (St. George).[2]  St. George is a small school district which actually only has one school building.  It provides elementary education, from pre-K through grade 8, to approximately 500 students.  Thomas Nuzzi (Tom) was hired prior to the 2004-2005 school year and signed a four-year employment contract, which ran from June 10, 2004, to June 30, 2008.  Tom's contract stated that the Board would issue a written evaluation of his performance prior to March 1 each year.  During his first year as superintendent, Tom also served as principal.  Tom impressed the Board with a variety of cost saving measures and new ideas.  Tom recommended, and the Board approved, the hiring of Loan Nguyen as the new bookkeeper at a salary of $25,000.  At the end of Nguyen's first year of employment, Tom was complimentary of her performance and recommended a $5,000 raise for her, which was approved by the Board.

The Board authorized the hiring of a principal for the 2005-2006 school year, and Janet Drews was hired at a salary of $68,000.  During the 2005-2006 school year, St. George was taken

---

[1]  The facts are taken from the Statements of Undisputed Facts provided by the parties and the exhibits filed.  This court has attempted to include only facts that are material to the claims at issue in this case.  This court has only included facts which are supported by the record, including deposition transcripts and business records.  This court has not considered Plaintiffs' affidavits for reasons which will be fully set out later in this Opinion.

[2]  This court notes that Plaintiffs have been involved in something of a "litigation spree." See Nuzzi v. Bourbonnais Sch. Dist., Case No. 07-2127 (summary judgment for Defendants granted December 17, 2008, affirmed by the Seventh Circuit January 11, 2010); Nuzzi v. Blanchette, Case No. 07-2132 (consolidated with Case No. 07-2127 and terminated July 24, 2007); Nuzzi v. Nguyen, Case No. 07-2238 (summary judgment granted in May 2009); Nuzzi v. St. George et al., Case No. 07-2239 (current case).

off the Illinois State Board of Education (ISBE) watch list. Tom continued to be complimentary of Nguyen's job performance. Tom was originally supportive of Drews, but later began criticizing her performance and ultimately recommended that her contract be non-renewed. On Tom's recommendation, Drews was non-renewed and left before the end of the 2005-2006 school year with a financial settlement.

Larry Custer testified that, during the 2005-2006 school year, he worked as a bus driver and, for a stipend of $400, acted as lead bus driver. Custer testified that Tom told him he was the transportation director. He testified that his duties included designing new bus routes, drawing maps, contacting the parents of new students, conducting pre-trip inspections of the equipment, meeting with the other bus drivers, and making sure the bus service was running well.

Tom's secretary, Kathy Ohrt, stated in her affidavit that she compiled the 2005-2006 average daily attendance figures for St. George after the 2005-2006 school year. She stated that she followed directions given to her by the ISBE in compiling the figures. She stated that Tom told her he wanted to review the figures and then told her he had changed them. Tom testified at his deposition that he changed the numbers Ohrt had prepared. The 2005-2006 final average attendance figures were submitted electronically using Tom's ISBE user ID. Ohrt stated that she told Jeff Mullikin, who she said was the president of the Board at that time,[3] that she did not want her name associated with Tom's figures because she did not want to be blamed for completing a report that contained false information. The difference between the numbers Ohrt calculated and the numbers Tom submitted led to an increase in the amount of general state aid St. George was entitled to receive. Ohrt left her

---

[3] Ohrt may have been mistaken about this. Richard Reyes testified that he became Board president in April 2005.

employment with St. George at the end of the 2005-2006 school year.

During the 2005-2006 school year, Deborah Nuzzi (Deborah) was working as a principal at Bourbonnais District #53 (Bourbonnais).[4] Deborah believed that she was subjected to sexual harassment and filed a lawsuit against Bourbonnais and one of the school board members. James DeZwaan was the superintendent at Bourbonnais at that time and was involved in the investigation of Deborah's sexual harassment allegations. Deborah applied for the principal position at St. George for the 2006-2007 school year. Tom was not involved in the interview process because his wife was a candidate. Following the interview process, the Board decided to hire Deborah as principal. Richard Reyes, who was Board president, negotiated her one-year contract directly with her. Following negotiations, Deborah entered into a written contract for the 2006-2007 school year which stated that her salary was $78,000. Deborah's contract term began on August 4, 2006 and ended June 30, 2007. The written contract stated that "[a]ny salary or other adjustment or modification made during the life of this Agreement shall be in the form of a written amendment and shall become a part of this contract . . . ." No written amendments were made to the contract.

In August 2006, Nguyen received a $10,000 raise based upon Tom's recommendation. Nguyen testified that she had a meeting with Tom before she did the September 2006 payroll. She testified that she took notes so she had a record of Tom's instructions. The notes showed that Tom instructed her to pay Deborah the contract salary amount of $78,000, plus additional compensation of $3,000 for grants, plus an additional $9,500 for transportation, for a total of $90,500. Nguyen testified that the additional amounts were for "Early Childhood Grant" and "Transportation Director." The notes showed that Deborah was to receive 11 checks of $8,227.27. Copies of

---

[4] It is undisputed that Deborah has education and administration degrees.

Deborah's paychecks, and the information provided with the checks, showed that her gross monthly earnings were $8,227.28, which was separated into three separate amounts of $272.73, $7,090.91, and $863.64. This court notes that 11 checks with gross earnings of $8,227.28 would result in total earnings of $90,500.08. In addition, $272.73 times 11 equals $3,000.03, which corresponds to the amount Nguyen testified Deborah was supposed to receive for grants, $7,090.91 times 11 equals $78,000.01, which corresponds to Deborah's contractual salary, and $863.64 times 11 equals $9,500.04, which corresponds to the amount Nguyen testified Deborah was supposed to receive as transportation director. Nguyen testified that Tom told her the payments needed to be in three separate accounts so the amount would seem lower and the Board would not pay attention. Nguyen also testified that Tom instructed her as to the accounts in the general ledger where she should account for each of the components of Deborah's compensation. Nguyen testified that she asked Tom why she was paying Deborah more than the salary stated in Deborah's contract and Tom told her to do as she was told.[5]

Custer testified that his stipend was increased to $650 for the 2006-2007 school year for his additional transportation duties. Sometime after Deborah was hired as principal for the 2006-2007 school year, Custer was informed that she was the transportation director. At that time, St. George had six or seven buses. Custer testified that he continued to perform all of the duties he performed the previous school year regarding bus service for students. Custer testified that procedures did not change after Deborah became transportation director. Custer testified that Deborah did not participate in meetings with bus drivers or have any involvement with transportation issues other than the type of involvement the principal of the school had always had. Custer testified he could

---

[5] This court notes that Tom was paid $100,879.98 for the 2006-2007 school year.

not think of anything Deborah did to discharge her job of transportation director. However, Diane Hurst, a secretary at St. George, stated in her affidavit that, "[w]hile working in the office at St. George School, [she] was a witness to Dr. Deborah Nuzzi working on tasks related to her duties as Transportation Director."

Nguyen testified that she became more and more concerned about Deborah's compensation above her contract amount and how the compensation was being included in the general ledger. In October 2006, Nguyen contacted Bill Bodemer, who was a member of the Board and served as treasurer. Bodemer testified that he met with Nguyen that same evening at her home. At the meeting, Nguyen told Bodemer that she believed Tom was overpaying Deborah and moving things from account to account illegitimately. Bodemer testified that he assured Nguyen that he would follow up on it. After the meeting, Bodemer spoke to Reyes and they decided the situation had to be confronted. Bodemer testified that, a few days later, he and Board member John Rietveld met with Tom. Bodemer testified that Tom was "personally offended" and explained that Deborah was not being overpaid because it was being covered by a grant. Bodemer testified that he was not satisfied with the explanation, because it still was an overpayment, but he and Reyes decided to monitor the situation and, if it was inappropriate, it would show at the end of the year. Reyes testified that he met with Tom and Tom told him "that the transportation stipend was coming from a transportation grant and that it was actually reducing her salary."

Nguyen also testified that, after Deborah became principal, there were problems with Tom and Deborah requesting reimbursement for the same expenses. She testified that she always caught it and did not actually pay for the same expenses twice. Nguyen testified that, in addition, Tom asked her to reimburse him from improper accounts to avoid detection by the Board. Nguyen

testified that this included Tom's requests to be reimbursed from the IMPREST fund for large items such as furniture for his office, when the IMPREST fund was supposed to be a petty cash fund. Nguyen testified that an expense such as furniture should have been submitted to the Board for approval. She testified that Tom signed a check for reimbursement of his expenses without any other signatures. On October 12, 2006, after he met with Nguyen regarding her concerns, Bodemer sent an email to Nguyen stating that the "Superintendent has been informed that there are no circumstances that make it appropriate for him to be the sole endorser of any checks other than payroll checks."

Nguyen testified that, after Tom was confronted by her complaints, he began to treat her differently and was cold and distant with her. Tom also began to complain to Board members about Nguyen's job performance and incompetence. This was shortly after he had recommended a significant raise for Nguyen. At the November Board meeting, Tom told the Board that St. George would save money by outsourcing Nguyen's position. At its meeting on January 25, 2007, the Board accepted Tom's recommendation and approved outsourcing Nguyen's position. A letter dated January 31, 2007, informed Nguyen that her position would be eliminated, as of March 16, 2007, "and an outside agency will handle the major responsibilities of the bookkeeper." Nguyen's last day of work at St. George was February 7, 2007. After her position was eliminated, she decided to approach the Board at its February 22, 2007, meeting and formally accuse Tom of wrongdoing. Nguyen prepared seven packets, one for each Board member, which included a letter explaining her accusations and documents she believed supported her allegations against Tom. In her letter, Nguyen told the Board that Deborah was being paid amounts in excess of the salary stated in her employment agreement. Nguyen also spelled out the details of improper reimbursement requests.

Reyes testified that, after receiving Nguyen's documents, the Board felt obligated to conduct a formal investigation. The Board contacted its attorney, Joe Perkoski, who recommended Kelly Hayden of The Management Association. The Board contacted her in March 2007 and Hayden subsequently conducted an investigation into Nguyen's allegations. In addition, Nguyen contacted a lawyer after her layoff. Nguyen testified that, after she told her attorney of the improprieties at St. George, the attorney contacted the Federal Bureau of Investigation (FBI) and the Illinois State Police. The FBI and the Illinois State Police began an investigation into Nguyen's allegations and interviewed Tom, Deborah, Board members and other witnesses. The report prepared following the investigation was forwarded to the Kankakee County State's Attorney's office. The State's Attorney's office ultimately decided not to initiate a criminal prosecution against Tom and Deborah.

In February 2007, during the investigation by the FBI and Illinois State Police, Custer was interviewed and was told that Deborah was receiving an additional $9,500 in salary for her position as transportation director. Custer testified that he complained more than once because he "was still doing all the work and she was getting most of the money." Custer testified that Deborah told him "that's why I have all these degrees and certificates" and that "you have to be an administrator to be a transportation director." At her deposition, Deborah testified, in relation to her duties as transportation director, that "a leader knows when their strengths are not as good as a person that they have delegated to." Custer testified that he "complained countless times about the transportation director position being a paid position of [$]9,500 versus a stipend all the years before." In April 2007, Custer had a meeting with Deborah and she raised various complaints about his performance. Custer testified that, in June 2007, Deborah told him words to the effect that he had "to clean up [his] act." Custer testified that Deborah also told him that the lead bus driver

position was eliminated. Custer testified that he learned the same day that Michael Raef, the husband of Tom's secretary, Jayne Raef, had been hired as co-lead bus driver and would be paid $3.00 more per hour than Custer. Custer testified that he resigned from his position in August 2007 and did not come back for the 2007-2008 school year. In his affidavit, Michael Raef stated that there were problems with Custer's job performance during the 2006-2007 school year.

Marci Kolberg testified that she is a CPA and is a shareholder in the accounting firm of Smith, Koelling, Dykstra & Ohm. She testified that she had performed audits for St. George and, in February 2007, began performing monthly bookkeeping for St. George. Kolberg testified that she was not aware of any inappropriate or illegal activities by Plaintiffs. She testified that she believed Nguyen's work was deficient. Reyes testified that, contrary to Tom's prediction, the district paid more to Kolberg's firm for bookkeeping than Nguyen's salary and St. George did not save money by outsourcing bookkeeping services.[6]

Deborah received her 11th paycheck on July 9, 2007. Kolberg testified that Tom gave her a figure, either by telling her what Deborah's total ending salary should be or by giving her an exact figure for the paycheck, and Deborah was paid $929.20 rather than $8,227.28, the amount of her other 10 paychecks that school year. Tom testified that he directed Kolberg as to the amount of Deborah's checks and signed all of the paychecks issued to employees of St. George. Kolberg testified that she had no idea what the amount of $929.20 was based on. With the 11th check reflecting gross earnings of $929.20, Deborah's gross earnings for the 2006-2007 school year were $83,202. Kolberg testified that she has no documents which explain how Tom came up with the

---

[6] The evidence shows that Nguyen has been rehired by St. George and is currently acting as St. George's bookkeeper.

total number of $83,202 as the salary amount to be paid to Deborah for the school year. Tom also testified that he had no documentation regarding Deborah's salary and payments for grant money and transportation director. He testified, however, that the Board orally agreed that she should be paid an unspecified additional amount of "grant money" and that this was an oral addition to her contract. Reyes testified that there was no discussion of Deborah being paid additional compensation to write grants in addition to her $78,000 salary. Reyes testified that his understanding is that grant writing is part of the expectation of a principal, within their salary. Reyes testified that Tom told him, when questions were raised about it, "that her salary was [$]78,000 and was not going to exceed 78." Kolberg testified that she has never seen any documentation which would support paying Deborah $5,202 over her contractual salary amount of $78,000 for grant writing. In her affidavit, Cathy Carter stated that she provides consulting services to St. George regarding grant writing and grant administration. She stated that she has training and eight years of experience in the area of grant writing and grant administration. She stated that her review of St. George's records showed that both Tom and Deborah failed to comply with various grant requirements during the time they were at St. George, including the requirement to document what grant funds were spent on.

Deborah's evaluation for the 2006-2007 school year was performed by Kay Pangle, the Regional Superintendent of Schools, because Tom could not perform an evaluation of his wife. Pangle gave Deborah a very positive evaluation and testified at her deposition that she found Deborah "excellent in all areas." Pangle also testified that she received e-mails from both Tom and Deborah "asking advice." Pangle testified that the relationship was "very professional."

Deborah contract was renewed for the 2007-2008 school year. Deborah's second contract,

effective July 1, 2007 to June 30, 2008, provided for a salary of $81,900 and included a provision which stated:

> In addition to the annual salary stated in paragraph A.2 of this Agreement, the principal may be entitled to Transportation director stipend upon fulfilling the job description responsibilities and proceeds received for grant writing when the Principal has performed the service of grant writing, is successful in obtaining a grant for the District and the grant provides compensation to the grant-writer.

Reyes testified that the Board met with Deborah in closed session to review her contract for the 2007-2008 school year. Reyes testified that Deborah told the Board that Pangle wanted to review the contract before she signed it. Reyes testified that the Board concluded it was a conflict of interest for Pangle to review Deborah's contract on Deborah's behalf and also act as Deborah's evaluator. Board members Peter Dubravec and Mark Grosso also testified that the Board determined that Pangle should not evaluate Deborah because of their relationship. Pangle testified that she was notified in November 2007 that she would not be performing the evaluation of Deborah's performance for the 2007-2008 school year.

Reyes testified that the Board conducted Tom's evaluation for the 2006-2007 school year in June 2007. Board member Sharon Thiesen, who was the secretary of the Board, testified that the composite score on the evaluation was about a three on the basis of a one to five scale. Tom disagreed with the evaluation. Reyes testified that, at the meeting regarding Tom's evaluation, Tom did not accept feedback and resisted it. Reyes testified that this was "unacceptable."

Kelly Hayden's report was released to the Board sometime prior to the beginning of the

2007-2008 school year.[7]  In her report, Hayden stated that she investigated the alleged overpayment of Deborah and the alleged inappropriate reimbursement of expenses to Tom.  Hayden concluded that Deborah had been overpaid.  Hayden stated that, while Deborah produced evidence of grants she had written and evidence that the grants authorized her to receive a portion for administrator duties, there was "no evidence that the Board authorized [Deborah] to perform these duties or to receive payment to perform these duties for the District."  Hayden recommended that Deborah be ordered to repay the overpayment of salary.  Hayden also recommended that Tom be reprimanded. She stated, "[a]s the leader of the District (and given his personal relationship with [Deborah]), it is incumbent upon [him] to ensure that ethical guidelines are adhered to, particularly in matters involving finances."

Hayden also concluded that there were problems with reimbursement requests.  She noted that it was clear that the superintendent was not to be the sole endorser of any checks other than payroll checks.  She noted that Tom was either "unaware of or chose to disregard this policy" and stated in his interview that he did have the ability to sign checks by himself if he wanted to.  She further noted that both Tom and Deborah frequently discussed the concept of "checks and balances" and relied on this as a defense to the inappropriate submission or "double" submission of reimbursement requests.  Hayden stated:

> However, if the superintendent can sign and approve expense checks
>
> by himself or direct his subordinates to approve these checks, then
>
> the checks and balances system will fail.   The investigator

_____

[7]  This court notes that the parties have agreed that the report was released to the Board in May 2007.  However, that cannot be correct because the report specifically references Deborah's July 2007 paycheck.  The report is not dated, but it seems safe to conclude that it was completed and released to the Board prior to the 2007-2008 school year.

recommends that in the future, the superintendent be required to
submit all expenses for approval to the Board of Education prior to
reimbursement and that he be clearly directed not to be the sole
endorser of any checks, payroll or otherwise in the District.

In her discussion of "double" requests for reimbursement, Hayden stated that, not only did Tom and
Deborah's stories not always match, but "they are simply not credible given the interviews that this
investigator conducted." Hayden further stated that "while it does not appear that reimbursements
were improperly paid to [Deborah] or [Tom], it does appear they were improperly submitted." She
recommended that they should be disciplined "concerning their past submission of inappropriate
expenses and warned that future violations could result in further discipline."

At the August 25, 2007, Board meeting, the Board decided to hire an auditor, Russell Leigh,
to conduct a full audit of the District's finances. Several Board members testified that Tom had not
been able to provide adequate financial information, which led to concerns among Board members.
Thiesen testified that there was an ongoing problem with getting financial reports in a format which
could be read and understood. Grosso testified that it took a long time for Tom to address the
Board's concerns about financial reports. Russell Leigh's audit showed that there were some
problems with St. George's financial statements and financial procedures. Reyes testified that the
findings in the Russell Leigh report raised the Board's level of concern about Tom's performance
and "confirmed the belief that he was not competent to perform his duties as a superintendent with
respect to the finances and procedures that support the finances of the District."

At the September 2007 Board meeting, Tom advised the Board that a keycard security
system had been installed. The new system rendered the Board members' old keys useless and cut

off their access to the school building when the building was closed. The Board asked Tom to provide Board members with key cards so they could get into the building to access documents regarding Board meetings. Tom refused and told the Board that there were issues regarding the privacy of school records as well as other concerns. Reyes and Thiesen both testified that student records were under lock and key and none of the Board members had keys to those file cabinets. Thiesen testified that the Board members "wanted to get access to get information, so that we could do the jobs that we were elected to do." Reyes and Thiesen testified that the Board agreed to move the District files to a janitor's closet away from the student records in order to alleviate Tom's concerns about confidentiality. Grosso testified that the Board made it clear to Tom that the Board members just wanted access to their own mailboxes so that the request was made within the confines of the privacy laws affecting students. Tom still resisted the request for key cards for Board members.

During this time, the Board was discussing Tom's performance during executive sessions, which are closed to the public. Tom was upset about this and began complaining that the Board was violating the Open Meetings Act. Tom believed that the Board discussed certain subjects in closed session that should have been covered in open session, including discussions of the Board members' requests for key cards. Tom insisted that issuing a key card to each Board member constituted a matter of "policy" to be decided by the Board on a full vote in open session. Reyes testified that the Board told Tom in executive session that his refusal to provide them access to the building was insubordination. Bodemer testified that personnel matters must be discussed in executive session because of privacy issues. This is a specific exception to the Open Meetings Act. The Board members who gave deposition testimony all agreed that, before going into executive session, the

statutory section setting out the exception was cited as the reason for the executive session. The Board members also testified that they always reconvened in open session before taking any Board action and before adjourning the meeting. Sometimes it was late at night and no one else was present when the meeting was adjourned.

Bodemer testified that Tom believed the Board had to state specific topics they would be talking about in closed session. On October 23, 2007, Tom sent an e-mail to St. George's counsel asking for clarification regarding what must be included on the Board meeting agenda regarding the reason for executive session. Perkoski responded to Tom's inquiry by e-mail and stated:

> There are two different standards with respect to closed session - one which pertains to what must be on the agenda and one which must be in a motion to move into closed session. With respect to the agenda, the only thing you have to say is that there will be a closed session - nothing more is required though some boards will identify the statutory cite or statutory language justifying the closed session. With respect to the motion made verbally at the meeting, the statutory reason must be in the motion - to avoid confusion we recommend that the person making the motion, either refer to the statutory cite or read the statutory exception language - or both. Beyond that, the specific discussion topic need not be on the agenda or in the motion. Only action items need to be listed with sufficient specificity.

Tom testified at his deposition that he continued to believe there should be some description of the topic of the closed session on the agenda and in the motion prior to going into closed session.

There was also an ongoing dispute between Tom and the Board regarding Tom's request that the Board negotiate a new contract for him because his four-year contract expired on June 30, 2008. On at least one occasion, Tom put the issue of negotiating his new contract on the agenda for a Board meeting. On October 22, 2007, Reyes sent Tom an e-mail telling him to remove that agenda item because "there is nothing to discuss until we understand the investigation results." Reyes testified that the Board did not want to discuss a new contract for Tom until after the Board had time to carefully review the investigation and audit results. Reyes also testified that the Board had lost confidence in Tom during that time period. Grosso testified that, by November or December of 2007, there was a pretty strong feeling that "it wasn't going to work" and the Board would not be renewing Tom's contract. David Hanson, who was on the Board a short time during this time period, testified that it looked to him like the Board was not going to renew Tom's contract.

On December 17, 2007, Plaintiffs filed a Complaint (#1) against Defendants. Plaintiffs alleged that Defendants violated the Open Meetings Act and the Illinois Freedom of Information Act. Prior to the Board's meeting on January 7, 2008, Tom and the Board agreed that Tom should go on paid administrative leave. Dubravec testified that the Board determined that Tom should go on administrative leave because the Board had serious concerns about Tom's performance. The Board had contacted DeZwaan, who was retired from Bourbonnais, about acting as interim superintendent. The January 7, 2008, Board meeting was held early in the morning. Deborah testified that she observed DeZwaan during the meeting. Deborah testified that she had a "panic attack" after seeing him because of the problems she had experienced at Bourbonnais. Deborah testified that she left the school following the meeting.

On January 7, 2008, Reyes sent Tom a letter regarding his administrative leave. In the letter,

Reyes stated, "[s]hould you need access to the school building at any time, please first contact Mr. DeZwaan to arrange for such access." On January 8, 2008, Deborah's doctor signed a letter which stated that Deborah was suffering from an "overwhelming stress reaction" and that she should not return to the workplace for at least four weeks. On January 10, 2008, DeZwaan sent Deborah a letter stating that he was in receipt of her physician's notification of her request for leave under the Family and Medical Leave Act (FMLA). DeZwaan asked her to have her physician complete an enclosed Certification of Health Care Provider.

Diane Hurst stated in her affidavit that, on January 14, 2008, she was instructed to treat Tom and Deborah as trespassers if she saw them on the property and should call law enforcement to have them removed. Bodemer stated in his affidavit that the "school has a practice of requiring all visitors to the building to come through the front door, check in with the office, and obtain authorization before being granted access to the school." Bodemer stated that, after Tom went on administrative leave and Deborah went on medical leave, staff at St. George were informed that Tom and Deborah had to follow the procedure that any visitor to the school had to follow. Bodemer stated that staff was informed that if either Tom or Deborah "did not follow proper check-in procedures the staff was to react as if they were any other unauthorized person attempting to access the building in an unauthorized manner." Thiesen testified that her understanding was that Tom and Deborah were to be treated the same as any other unauthorized person if they came to the school premises.

The Board decided not to renew Tom's contract and notified him by letter dated January 31, 2008. Board member Darrell Pendleton testified that Tom's contract was not renewed because of "long-standing problems." Reyes testified that the Board had a laundry list of reasons not to renew

Tom's contract. Tom was paid through the end of his contract term, June 30, 2008. Kolberg testified that Tom was paid everything he was owed. Documentation prepared by Kolberg showed that Tom was paid his salary and was also paid for vacation days.

While Deborah was on medical leave, DeZwaan performed her evaluation. State law required that her evaluation be completed by February 1. DeZwaan has the qualifications necessary to perform the evaluation of a principal. DeZwaan sent Deborah a letter, dated January 18, 2008, informing her that her evaluation needed to be completed by February 1 and asking her to schedule a time to meet with him. In his letter, DeZwaan stated "[i]f you decide not to meet with me I will proceed to complete the evaluation instrument in accordance with *The Illinois School Code* and your employment contract with the St. George School District." Deborah testified that she believes she did not receive this letter until after her evaluation was already completed.

According to St. George's records, Deborah's sick and vacation time ran out on February 15, 2008, but St. George paid her until February 29, 2008. The unpaid part of her 12-week leave under the FMLA began on that date. On February 27, 2008, St. George's attorneys sent Deborah a letter stating that her paid leave would be exhausted as of February 29, 2008. The letter also informed her that, prior to her return from her current leave, she would be required to provide St. George with a return to work certification from her physician. Letters from Deborah's doctors stated that she continued to be unable to return to work for the remainder of the school year.

Based in part on deficiencies noted in DeZwaan's evaluation, the Board decided not to renew Deborah's contract. On April 3, 2008, Deborah was sent a notice of the non-renewal of her contract. This was sent more than 45 days before the end of the school year, as required by the School Code.

In 2009, the State of Illinois conducted an audit of the 2005-2006 general state submission

and ordered St. George to reimburse the State over $300,000 for over-counting both attendance and busing figures and for not being able to support the submissions with any documentary evidence. The numbers for the 2005-2006 school year that resulted in this audit had been submitted electronically by Tom after he changed the numbers prepared by Ohrt. St. George attempted to reconstruct the attendance records from the 2005-2006 school year and requested a second audit. The second audit has resulted in the preliminary conclusion that St. George owes the State $67,956.

PROCEDURAL HISTORY

As previously noted, Plaintiffs initially filed their Complaint in this case on December 17, 2007. Plaintiffs eventually filed a Third Amended Complaint (#22) on June 18, 2008. In Count 1, Plaintiffs alleged that St. George denied Tom leave he requested for "serious health conditions" and "based on the need to care for an adopted child during the 2007-2008 school year" in violation of the FMLA.[8] In Count 2, Plaintiffs alleged that St. George refused Deborah leave she requested "during periods of her serious health conditions and illnesses which made her unable to work and during the period of need to care for a family member, an adopted child," in violation of the FMLA. Plaintiffs also alleged that St. George retaliated against Deborah based upon her exercise of her rights under the FMLA. In Count 3, Plaintiffs alleged that St. George retaliated against Deborah for engaging in protected activity under Title VII when it hired DeZwaan to supervise her. In Count 4, Plaintiffs alleged that Defendants retaliated against them in violation of the Illinois Whistleblower Reward and Protection Act. In Count 5, Plaintiffs alleged that St. George terminated their employment because they filed claims under the Illinois Workers Compensation Act, in violation of Kelsay v. Motorola, Inc., 74 Ill. 2d 172 (1978). In Count 6, Plaintiffs alleged that Defendants

---

[8] Tom testified at his deposition that he never made a FMLA claim.

violated the Illinois Open Meetings Act, 5 Ill. Comp. Stat. 120.  In Count 7, Plaintiffs alleged that

Defendants violated the Illinois Freedom of Information Act.  In Count 8, Plaintiffs alleged that

Defendants were liable for the violation of their constitutional rights under 42 U.S.C. § 1983.  In

Count 9, Plaintiffs alleged that Defendants were liable for a violation of the Racketeer Influenced

and Corrupt Organizations (RICO) Act.  In Count 10, Plaintiffs alleged that St. George was liable

to Deborah for breach of her contract and, in Count 11, Plaintiffs alleged that St. George was liable

to Tom for breach of his contract.

On October 21, 2008, this court entered an Order (#36) which accepted a Report and

Recommendation (#33) filed by Magistrate Judge David G. Bernthal.  This court's Order granted,

in part, and denied, in part, Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint

(#24).  As relevant here, this court specifically stated that Counts 4, 5, 7, 8 and 9 were dismissed.[9]

This court stated that the remaining claims were the FMLA claims in Counts 1 and 2, the Title VII

claim in Count 3, the Open Meetings Act claim in Count 6, except for the request for money

damages, and the breach of contract claims in Counts 9 and 10.[10]

On February 24, 2009, Defendants were allowed to file a Counterclaim (#42) against

Plaintiffs.  On July 10, 2009, Defendants filed an Amended Counterclaim (#80).  In Count 1,

Defendants alleged that Tom breached his fiduciary duty to Defendants by overpaying or attempting

to overpay Deborah, his wife, in excess of the salary approved by the Board.  In Counts 2, 3, and 4,

---

[9]  Plaintiffs were allowed 14 days to file an amended complaint as to some of these claims, but Plaintiffs did not further amend their complaint.

[10]  To the extent that there appears to be some confusion about Count 8, this court concludes that this claim was clearly dismissed by this court's Order.  This court notes that, on December 17, 2008, Plaintiffs filed a Response (#38) which stated that they would not be seeking to amend the constitutional claim in Count 8.

Defendants alleged that Tom breached his fiduciary duty to Defendants by submitting receipts for reimbursement and directing the bookkeeper to issue those funds from improper accounts, by submitting the same receipts for reimbursement as his wife in an attempt to be reimbursed for the same expense twice, and by receiving reimbursement for a payment he claimed he made to the Marriott Hotel when he had not, in fact, paid the bill at the time reimbursement was requested. In Count 5, Defendants alleged that Tom was liable for breach of contract because he acted dishonestly, mismanaged and/or misappropriated District funds or directed another to do the same. In Count 6, Defendants alleged that Deborah breached her fiduciary duty by accepting or attempting to receive a salary in excess of that which was approved by the Board without Board approval, knowledge or written amendment. In Count 7, Defendants alleged that Deborah breached her fiduciary duty by submitting the same receipts for reimbursement as her husband. In Count 8, Defendants alleged that Deborah was liable for breach of contract because she was paid in excess of the salary approved by the Board without Board approval or written amendment of the contract. In Count 9 and 10, Defendants alleged that Tom breached his fiduciary duty by paying his wife a portion of her salary that purported to be for grant writing when the grants she was being paid for had not yet been submitted and/or approved and that Deborah breached her fiduciary duty by receiving money for grant writing prior to the grant being approved and prior to the grant money being disbursed. In Count 11, Defendants alleged that Tom breached his fiduciary duty by submitting to the ISBE altered attendance numbers which increased the amount of money the District received for General State Aid from the State of Illinois, which damaged the District because the District will be required to return a portion of the funds following an audit for the 2005-2006 school year. In Counts 12 and 13, Defendants alleged that Tom and Deborah are liable for conversion because they have not

returned three laptop computers and accompanying equipment owned by the District.

The parties have filed Motions for Summary Judgment and various related motions which are now before this court for ruling.

ANALYSIS

MOTIONS FOR LEAVE TO FILE

Plaintiffs did not file their Response to Defendants' Rule 56(b) Motion for Summary Judgment (#116) within the time allowed by the applicable Local Rules or within the extended time allowed by this court. This court, however, will grant Plaintiffs' Motion for Leave to File their late response (#137). Therefore, the documents Plaintiffs submitted in Response to Defendants' Motion for Summary Judgment (#116) are considered filed by this court.

Plaintiffs also did not file a timely Response to Defendants' Rule 56(a) Motion for Summary Judgment on Defendants' Counterclaims (#128). On December 6, 2009, Plaintiffs filed a Motion for Extension of Time to File their Response (#145). Plaintiffs filed their Response, and supporting exhibits, on December 14, 2009. Plaintiffs' Motion for an Extension of Time (#145) is GRANTED and the documents Plaintiffs have submitted in Response to Defendants' Rule 56(a) Motion for Summary Judgment on Defendants' Counterclaims (#128) are considered filed by this court.

In addition, Plaintiffs did not file a timely Response to Defendants' Motion to Strike and for Sanctions (#161). On January 28, 2010, Plaintiffs filed a Motion for Leave to File a Response (#171). Plaintiffs also filed a Response is Opposition to Defendants' Motion for Sanctions (#172). Plaintiffs' Motion for Leave to File (#171) is GRANTED and Plaintiffs' Response (#172) is considered filed by this court.

## MOTIONS TO STRIKE

This court notes that Motions to Strike are disfavored.  See <u>Orr v. Roberson Mgmt Corp.</u>, 2007 WL 809665, at *1 n.1 (C.D. Ill. 2007).  The Seventh Circuit has expressed the opinion that motions to strike "are not only unnecessary (from the parties' perspective) but also pointless (from the judiciary's)." <u>Custom Vehicles, Inc. v. Forest River, Inc.</u>, 464 F.3d 725, 727-28 (7th Cir. 2006). Therefore, this court generally relies on its ability to consider only arguments and facts which are properly presented and rarely grants motions to strike.  <u>See</u>, <u>e.g.</u>, <u>Orr</u>, 2007 WL 809665, at *1 n.1; <u>Bloomington Partners, LLC v. City of Bloomington</u>, 2006 WL 2578916, at *8 (C.D. Ill. 2006).  This court has routinely stated that it is confident that it can rely only on admissible evidence and proper and accurate statements of the facts in ruling on a Motion for Summary Judgment.  See <u>Nuzzi v. Bourbonnais Elementary Sch. Dist.</u>, 2008 WL 5273669, at *5 (C.D. Ill. 2008), <u>aff'd</u>, 2010 WL 114195 (7th Cir. 2010).

## I.  MOTION TO STRIKE (#104)

On September 17, 2009, Defendants filed a Motion to Strike and Response to Plaintiff Deborah Nuzzi's Motion for Summary Judgment (#104).  Defendants argued that Deborah's Motion for Summary Judgment should be stricken for failure to comply with Rule 7.1 of the Local Rules of the Central District of Illinois.  Defendants pointed out that the Motion for Summary Judgment did not include an "Introduction," was replete with facts that are immaterial and inadmissible, and did not include any citation to relevant law or explain any legal points in the "Argument" section. Defendants did also include their Response to Deborah's Motion for Summary Judgment.

This court agrees with Defendants that the Motion for Summary Judgment filed by Deborah is deficient in many areas.  This court is particularly troubled by the brash legal conclusions with

absolutely no citation to legal authority. However, because Defendants have responded to the Motion for Summary Judgment, this court declines to strike the Motion. Defendants' Motion to Strike (#104) is DENIED.

## II. MOTION TO STRIKE (#106)

On September 18, 2009, Defendants filed a Motion to Strike Exhibit One of Plaintiff's Motion for Summary Judgment (#106). Defendants stated that Exhibit One attached to Deborah's Motion for Summary Judgment was her own affidavit. Defendants argued that Deborah's affidavit should be stricken because it did not comply with Rule 56(e)(1) of the Federal Rules of Civil Procedure. Defendants argued that Deborah's affidavit included inadmissible hearsay, speculation and unsupported argumentation and also included statements which contradicted her prior deposition testimony. Defendants pointed out that Deborah testified at her deposition that she never requested FMLA leave but stated in her affidavit that she "sought time off for illness experienced pursuant to the Family and Medical Leave Act which was granted by Defendant in January 2008."

Plaintiffs were allowed an extension of time to respond to Defendants' Motion to Strike (#106), and filed their Response (#121) on October 30, 2009. Plaintiffs argued that Deborah's affidavit should not be stricken because the statements in the affidavit were supported by the evidence. Plaintiffs argued that the statement cited by Defendants did not contradict her deposition testimony. Plaintiffs acknowledged that Deborah testified at her deposition that she "didn't" make an FMLA claim, but noted that she then stated the "Board made it for me and sent me some kind of a document saying that my FMLA was approved."

This court has already noted that Motions to Strike are not favored. However, following review of Deborah's affidavit, this court concludes that it must be stricken. This court agrees with

Defendants that the affidavit includes a statement which contradicts Deborah's sworn deposition testimony, with no explanation of the discrepancy.  Although it is a minor contradiction, which would not normally require striking the affidavit, the affidavit also includes unsupported hearsay, speculation, legal conclusions and argument.

Rule 56(e)(1) provides:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.

Fed. R. Civ. P. 56(e)(1).  A court may strike from an affidavit any statement that is inadmissible hearsay, speculation or unsupported argument.  See Pfeil v. Rogers, 757 F.2d 850, 861-63 (7th Cir. 1985).

In addition, a party cannot prevail on a motion for summary judgment by "submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony."  Adusumilli v. City of Chicago, 164 F.3d 353, 360 (7th Cir. 1998), quoting Diliberti v. United States, 817 F.2d 1259, 1263 (7th Cir. 1987).  Therefore, "[w]here deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken. . . ."  Adusumilli, 164 F.3d at 360, quoting Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995).  This is because affidavits, "when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy."

Beckel v. Wal-Mart Assocs., Inc., 301 F.3d 621, 623 (7th Cir. 2002). This explanation must come in the affidavit itself. Beckel, 301 F.3d at 623.

In a prior case involving Deborah, this court stated that it was disregarding statements in the affidavits submitted by Deborah to this court which contradicted prior deposition testimony as well as statements in the affidavits which were self-serving and conclusory, not based on personal knowledge, or which required speculation regarding the motivation of persons other than the affiant. Nuzzi, 2008 WL 5273669, at *4, citing Adusumilli, 164 F.3d at 359. Unfortunately, Plaintiffs apparently paid no attention to this court's prior ruling and submitted an affidavit with many of the same defects. This court notes that the explanation of the discrepancy between the affidavit and Deborah's deposition testimony came in Plaintiffs' response to the Motion to Strike rather than the affidavit itself. This court therefore concludes that the affidavit must be stricken and Defendants' Motion to Strike (#106) is GRANTED.

III. MOTION TO STRIKE (#161)

On December 31, 2009, Defendants filed a Motion to Rule Plaintiffs' Affidavits (#137-6 and #138) Inadmissible or to Strike the Affidavits and for Sanctions Under FRCP Rules 11 and 56(g) (#161). Defendants noted that Plaintiffs' Response to Defendants' Rule 56(b) Motion for Summary Judgment included affidavits prepared by both Tom and Deborah. Tom's affidavit is 107 pages (although a few of the pages are blank) and Deborah's affidavit is 94 pages. Defendants argued that the affidavits do not comply with Rule 56(e) of the Federal Rules of Civil Procedure, the Federal Rules of Evidence or the Local Rules of the Central District of Illinois.[11]

_____

[11] This court notes that both Tom and Deborah submitted very similar affidavits in support of their Response to Defendants' Rule 56(a) Motion for Summary Judgment on their Counterclaims. In their Reply (#170), Defendants noted that the "affidavits submitted by Tom and Deborah Nuzzi suffer from the same defects as those submitted in support of their Response

This court notes that the affidavits submitted by Tom and Deborah in this case are truly among the most amazing documents this court has ever read. Some examples are in order. In Tom's affidavit, he states:

> The undisputed documented facts produced in print and deposition of
>
> the plaintiffs and their witnesses showed that the St. George School
>
> Board violated the Open Meetings Act numerous times (B.9-8).
>
> Thomas Nuzzi had numerous trainings about adhering to the Open
>
> Meetings Act, much of which was done by the St. George School
>
> Board attorneys and their firm of Robbins, Schwartz, et al. (II.187,
>
> II-187-1, II.187-2).

This court notes that Exhibit B.9-8 and Exhibits II.187, 187-1 and 187-2 contain general information regarding the Open Meetings Act with handwritten notations, presumably made by Tom. Obviously, Tom's broad conclusion regarding violations of the Open Meetings Act is not supported by the cited exhibits. As part of a very weirdly numbered "Additional Facts from Plaintiff," Tom stated, on page 100 of his 107-page affidavit, "The saying goes something like this: When we start developing the power of love over the love of power will we find true happiness."

In Deborah's affidavit, she responded to paragraph 106[12] in Defendants' Statement of

_____

to the Rule 56(b) Motion for Summary Judgment, which were also the subject of a motion to strike and for sanctions filed on December 31, 2009." Defendants stated that the affidavits submitted by Tom and Deborah with respect to both motions for summary judgment were "virtually identical." Defendants stated that the same sanctionable conduct had occurred but they "did not wish to inundate this Court with another almost identical filing."

[12] Paragraph 106 stated "On Deborah's paycheck Loan showed the $863.64 payment coming out of 'Transportation Salaries' as Tom had instructed, but attempted to properly account for it on the general ledger, by first posting it in 'Transportation Salaries,' which matched Deborah's paycheck, then making an 'adjusting entry' to transfer it to the 'Transportation Leader' account, where it properly belonged as an expense category."

Undisputed Facts as follows:

> This feels like and [sic] Abbott and Costello Movie Scene to the Plaintiffs. This situation relies on an incompetent and dishonest bookkeeper giving inaccurate information to attorneys who know nothing about educational finance. We keep going around and around with entries that are all explained by the fact that the bookkeeper Loan Nguyen did not know which were the correct codes in which to place certain financial items. Loan Nguyen took salary out of a code for Medical Insurance II.63). Thomas Nuzzi, as superintendent, caught the error and told her to fix it. End of story! Thomas Nuzzi made sure that these expenditures were clearly noted on Deborah Nuzzi's paycheck by having it broken out into the three revenue streams by amount, which the board sees and approves by signing every month (II-90)!
>
> Exhibits II-63, II-103, II-103-2, II-90

This court has reviewed the cited exhibits and finds that they do not support the statements included in this paragraph of Deborah's affidavit. Deborah also stated:

> Rich Reyes thought every independent woman was out of control. He believes that women are not best suited for a job that he perceives as powerful. He does not treat his wife with respect and many people

in the community talk about this.[13]

On January 28, 2010, Plaintiffs filed their Response in Opposition to Defendant's Motion for Sanctions (#172). Plaintiffs argued that the United States Supreme Court has not required that "summary judgment materials must satisfy trial admissibility standards," citing Celotex Corp. V. Catrett, 477 U.S. 317, 324 (1986). Plaintiffs also argued that this court should not penalize them for making "arguments for legal evolution." Plaintiffs acknowledged that their affidavits contained "colorful surplusage" but argued it was "quite understandable" given how they have been "victimized" and considering what they have been subjected to.

As this court stated previously, affidavits provided in opposition to a Motion for Summary Judgment must "set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). The affidavits provided by Tom and Deborah clearly do not comply with this requirement, as demonstrated by the examples set out by this court. The lengthy affidavits are long on self-promotion, character assassination, speculation on motives and irrelevant statements of personal beliefs and short on "facts that would be admissible in evidence." Plaintiffs are correct that they are not required to "produce evidence in a form that would be admissible at trial," so that affidavits may properly be used in opposition to summary judgment. See Celotex Corp., 477 U.S. at 324. However, any affidavits submitted must comply with the requirements of Rule 56(e)(1). This court concludes that it should not be required to weed through approximately 100-page affidavits to determine whether there are any actual facts, based upon personal knowledge, which could be considered in ruling on Defendants' Motion for

---

[13] As outrageous as these examples are, they do not begin to adequately describe the pages and pages of unsupported "rants" and commentary included in the affidavits. In their Motion (#161), Defendants actually set out almost 200 examples of inappropriate statements included in the affidavits along with an explanation of why they are objectionable.

Summary Judgment. This court therefore agrees with Defendants that the affidavits submitted by Tom and Deborah in Opposition to Defendants' Rule 56(b) Motion for Summary Judgment must be stricken.[14]  This court also concludes that the affidavits submitted by Tom and Deborah in opposition to Defendants' Rule 56(a) Motion for Summary Judgment are essentially identical and suffer from the same defects.  These affidavits are also stricken.

In their Motion (#161), Defendants have asked for sanctions pursuant to Rule 56(g) of the Federal Rules of Civil Procedure.  Rule 56(g) provides:

> If satisfied that an affidavit under this rule is submitted in bad faith
> or solely for delay, the court must order the submitting party to pay
> the other party the reasonable expenses, including attorney's fees, it
> incurred as a result.  An offending party or attorney may also be held
> in contempt.

Fed. R. Civ. P. 56(g).  This court concludes that the submission of approximately 100-page affidavits which consist almost entirely of rambling, unsupported "rants" can only be considered done in "bad faith."  The affidavits submitted by Plaintiffs in this case are the worst this court has ever seen or could imagine. This court additionally notes that it has considered Plaintiffs' pattern of submitting affidavits which do not meet the requirements of Rule 56(e)(1).  Plaintiffs' argument that they should not be penalized for arguing for "legal evolution" is unpersuasive considering that affidavits are meant to set out facts rather than argument.  See Pfeil, 757 F.2d at 862.  This court also

---

[14]  This court notes that, in their Motion (#161), Defendants have suggested that Plaintiffs should be ordered to submit new affidavits that comply with the rules.  Plaintiffs did not respond to this suggestion in their Response to the Motion (#172) and have not requested an opportunity to file new affidavits.  This court concludes that there is no reason to give Plaintiffs such an opportunity long after the deadline for responding to the Motions for Summary Judgment has passed.

finds Plaintiffs' argument that their obviously improper affidavits are "understandable" is entirely

unpersuasive. Litigants often feel they have been mistreated. That does not mean they can say any

unsupported thing they want in an affidavit. That conduct is sanctionable.

For all of the reasons stated, this court concludes that sanctions are warranted under Rule

56(g). Because of this determination, this court does not need to consider Defendants' argument that

sanctions should be imposed under Rule 11.[15] This court concludes that an award of attorney's fees

and costs will be an adequate sanction, especially considering that the affidavits have been stricken.

Therefore, this court declines to enter a finding of contempt, although holding Plaintiffs and their

attorney in contempt could certainly be justified on this record. Defendants are allowed 30 days to

submit an affidavit documenting the attorney's fees and costs Defendants incurred in responding to

Plaintiffs' sanctionable affidavits. Plaintiffs will have 14 days to file objections to Defendants'

request for attorney's fees and costs.

MOTIONS FOR SUMMARY JUDGMENT

I. SUMMARY JUDGMENT STANDARD

Summary judgment may be requested by a defending party under Rule 56(b) and by a

claiming party under Rule 56(a). Fed. R. Civ. P. 56(a), 56(b). Summary judgment is appropriate

"if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In

ruling on a motion for summary judgment, a district court has one task and one task only: to decide,

---

[15] This court notes, however, that Defendants are correct that "[t]here can be only two
explanations for an attorney allowing such affidavits to be filed: either he did not read them, or
he read them and made a reasoned judgment that the objectionable material was appropriate."

based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002). Speculation, however, is not the source of a reasonable inference. See Burwell, 213 F. Supp. 2d at 929, citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998). In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." Nuzzi v. Nguyen, 2009 WL 1409703, at *8 (C.D. Ill. 2009).

Therefore, the nonmoving party cannot rest on mere allegations or denials to overcome a motion for summary judgment; "instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp., 477 U.S. at 322-23.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS

Defendants argue that they are entitled to summary judgment under Rule 56(b) as to all of the claims remaining in Plaintiffs' Third Amended Complaint. This court agrees.

### A. FMLA CLAIMS

In Plaintiffs' Third Amended Complaint, Plaintiffs alleged in Count 1 that Tom was "entitled to leave based on serious health conditions making [him] unable to perform" his job functions and "based on the need to care for an adopted child during the 2007-2008 school year." As this court has noted previously, Tom testified at his deposition that he never made a FMLA claim. In Response to Defendants' request for summary judgment on this claim, Plaintiffs stated that they agreed to voluntarily withdraw any claims by Tom of an FMLA violation. Accordingly, Defendants are entitled to summary judgment on Count 1 of Plaintiffs' Third Amended Complaint. This court additionally notes that Defendants are correct that it is now clear that Count 1 had absolutely no factual support whatsoever. This court declines Defendants' invitation to impose sanctions but notes that it is not the only example in this case of a complete disconnect between Plaintiffs' pleadings and their deposition testimony.

In Count 2 of Plaintiffs' Third Amended Complaint, Plaintiffs alleged that St. George was liable under the FMLA because it "refused to allow leave to [Deborah] during periods of her serious health conditions and illnesses which made her unable to work and during the period of need to care for a family member, an adopted child." Plaintiffs also alleged that St. George took adverse action against Deborah based on the exercise of her rights under the FMLA by refusing her entrance to the school building and by terminating her employment.

Defendants argue that St. George is entitled to summary judgment on Deborah's claim under the FMLA because Deborah was, in fact, allowed all of the FMLA leave to which she was entitled and because there is no evidence to support her retaliation claims. In Plaintiffs' Response, they state that they are disputing when Deborah's 12 weeks of FMLA leave ended. Plaintiffs also argue that Deborah requested leave related to the "serious illness of their daughter and the adoption of children

by them."  Plaintiffs argue that this "dispute as to facts makes summary judgment inappropriate."  Plaintiffs also contend, with no elaboration, that they are entitled to summary judgment on Deborah's claim of retaliation.  This court notes that the evidence is clear that Deborah did not request FMLA leave in October 2007, when the evidence shows that she traveled to Ethiopia to visit her daughter when the daughter was adopting a child and had some health concerns.  Deborah was paid during her trip by using vacation time and sick days.  Also, Deborah testified during her deposition that Plaintiffs adopted two Ethiopian children and brought them to the United States in February 2009.  Obviously, Deborah did not request FMLA leave related to the adoption of these children because her employment at St. George ended when her contract terminated June 30, 2008, and was not renewed.  Amazingly, Plaintiffs seem to be arguing that direct contradictions between the claims in their Complaint and their deposition testimony raise a genuine issue of material fact for trial.  That is not the case.

The FMLA entitles eligible employees "to a total of 12 workweeks of leave" for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D); Vail v. Raybestos Prods. Co., 533 F.3d 904, 909 (7th Cir. 2008), cert. denied, 129 S. Ct. 1361 (2009).  The FMLA further states that "[i]f an employer provides paid leave for fewer than 12 workweeks . . ., the additional weeks of leave necessary to attain the 12 workweeks . . . of leave required under this subchapter may be provided without compensation."  29 U.S.C. § 2612(d)(1).  In this case, when Deborah went on medical leave beginning January 7, 2008, she was on paid leave until February 29, 2008.  The unpaid portion of her 12-week FMLA leave then began and would have continued until early April

2008.[16]  In fact, Deborah remained an employee of St. George on unpaid leave until her contract expired on June 30, 2008.  There is absolutely no evidence that Deborah did not receive the FMLA leave to which she was entitled.  Plaintiffs' claim appears to be premised on their contention that the 12 weeks of FMLA leave did not start until Deborah's paid leave ended.  However, that is contrary to the plain language of the FMLA.  See 29 U.S.C. § 2612(d)(1), (2).  Plaintiffs have provided no citation of any authority to support their unique interpretation of the FMLA.  Moreover, even accepting Plaintiffs' unsupported argument, Deborah actually was on unpaid leave for more than 12 weeks after February 29, 2008.[17]  This court therefore concludes that there is no genuine issue as to any material fact regarding whether St. George violated the FMLA by not providing Deborah 12 weeks of leave due to her serious health condition.

As far as Deborah's retaliation claim, the FMLA makes it unlawful to discharge or in any other manner discriminate against an individual based upon the exercise of FMLA rights.  See Cole v. Ill., 562 F.3d 812, 815 (7th Cir. 2009), quoting 29 U.S.C. § 2615(a)(2).  Plaintiffs are content to rely on the fact that Deborah was on FMLA leave when the decision not to renew her contract was made.  However, this court concludes that this is not direct evidence of retaliation under the FMLA.  See Cracco v. Vitran Express, Inc., 559 F.3d 625, 633-34 (7th Cir. 2009).  The Seventh Circuit has held that "[s]uspicious timing alone rarely is sufficient to create a triable issue."  Cole, 562 F.3d at

---

[16]  St. George's attorneys sent Deborah a letter on February 29, 2008, which stated that her FMLA leave would expire on March 24, 2008.  This appears to be a miscalculation of the 12-week period following the beginning of her leave, January 7, 2008.  In any case, Deborah continued to provide letters from her doctors stating that she was unable to return to work and was, for practical purposes, on leave until the end of her contract term, June 30, 2008.

[17]  Plaintiffs have provided no evidence to support their contention that she was actually "terminated" during that time.  This court specifically notes that Plaintiffs' reliance on Pangle's testimony is entirely misplaced.  Pangle testified that she did not know whether Deborah was terminated.

816, quoting Andonissamy v. Hewlet-Packard Co., 547 F.3d 841, 851 (7th Cir. 2008). The question is whether the plaintiff was terminated "on account of" the exercise of her right to FMLA leave. Cole, 562 F.3d at 815.

In this case, the evidence shows that St. George had many legitimate reasons for the non-renewal of Deborah's contract. The Board had received Hayden's report which concluded that Deborah had been overpaid for the 2006-2007 school year and had inappropriately submitted requests for the reimbursement of expenses. In addition, the Board had received DeZwaan's evaluation of Deborah's performance which noted numerous deficiencies in her performance. Plaintiffs have complained, bitterly, regarding the fact that DeZwaan's evaluation was performed while she was on medical leave and was performed without interviewing Deborah. While there is some question regarding whether DeZwaan provided Deborah with a timely opportunity to meet with him during the interview process, the evidence shows that DeZwaan was certified to perform evaluations and gathered the information necessary to evaluate Deborah's performance. The Board could legitimately rely on DeZwaan's evaluation in making its decision not to renew Deborah's contract. This court further concludes that Deborah cannot show retaliation based upon the indirect method because she cannot show that she was meeting St. George's legitimate expectations and has not shown that the reasons given for the non-renewal of her contract were a pretext for discrimination based upon her FMLA leave. See Cracco, 559 F.3d at 634-35.

This court additionally concludes that Plaintiffs have not shown that Deborah was subjected to retaliation when Defendants did not allow her access to the school building. Deborah could have made an appointment to come to the school, like any other visitor, and could have retrieved her personal belongings, while accompanied. This court agrees with Defendants that, because

Deborah's psychiatrist sent a letter stating that Deborah could not work because she had mental and emotional problems, it was reasonable for St. George to restrict her access to the school until a doctor stated that she was fit to return.

For all of the reasons stated, this court concludes that St. George is entitled to summary judgment on Count 2 of Plaintiffs' Third Amended Complaint.

## B. TITLE VII CLAIM

In Count 3 of their Third Amended Complaint, Plaintiffs alleged that St. George is liable for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiffs claim that Deborah engaged in protected activity when she complained of sexual harassment during her employment with Bourbonnais and St. George retaliated against her by hiring DeZwaan as interim superintendent and terminating her employment. Plaintiffs have provided no supporting authority for this rather novel claim that St. George retaliated against her because she sued Bourbonnais. "The Seventh Circuit has made it clear that a litigant who fails to support a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point." Nuzzi, 2009 WL 1409703, at *6, citing Doe v. Johnson, 52 F.3d 1448, 1457 (7th Cir. 1995). In addition, Plaintiffs have provided no evidence that Deborah's sexual harassment claim against Bourbonnais had anything to do with the Board's decision to hire DeZwaan, a retired superintendent from the same area who had many years of experience. In their Response to Defendants' Motion for Summary Judgment, Plaintiffs argued that Defendants acted inappropriately because they had Deborah "supervised by the person they knew she had sued for sexual harassment." This argument is baseless. DeZwaan was not a Defendant in Deborah's unsuccessful lawsuit against Bourbonnais and Rob Rodewald. See Case No. 07-CV-2127. This court also concludes that Plaintiffs have

provided absolutely no evidence that Deborah's lawsuit against Bourbonnais had anything to do with St. George's decision not to renew her contract. For the reasons stated, this court agrees with Defendants that St. George is entitled to summary judgment on this claim.

## C. OPEN MEETINGS ACT CLAIM[18]

Defendants are clearly entitled to summary judgment on this claim and little discussion is necessary. The Open Meetings Act provides that any person may bring a civil action for an alleged violation within 60 days of the meeting alleged to be in violation. 5 Ill. Comp. Stat. 120/3(a) (West 2008). Plaintiffs' Complaint was filed on December 17, 2007, and thus the only meetings at issue are those within 60 days prior to December 17, 2007. Any complaint about a meeting prior to that is time-barred.

The Open Meetings Act provides that meetings of public bodies shall be open to the public unless an exception applies. 5 Ill. Comp. Stat. 120/2(a) (West 2008). The statute states that "[a] public body may hold a meeting closed to the public, or close a portion of a meeting to the public, upon a majority vote of the quorum present, taken at a meeting open to the public for which notice has been given as required by this Act." 5 Ill. Comp. Stat. 120/2a (West 2008). The statute requires a public recorded vote by each member on the question of going into closed session along with a public "citation to the specific exception contained in Section 2 of this Act which authorizes the closing of the meeting to the public." 5 Ill. Comp. Stat. 120/2a (West 2008). This court agrees with Defendants that nothing else is required, despite Tom's strongly held, but unsupported, belief that the Open Meetings Act requires the subject of a closed session meeting to be disclosed in open

---

[18] This court notes that both Defendants and Plaintiffs have asked this court to rule on the pendent state law claims in this case.

session.

Defendants provided ample evidence that, at the meetings at issue, the members of the Board announced that they were entering closed session in accordance with the Open Meetings Act, announced the statutory exception, resumed open session before adjourning and never took final action in closed session. This court notes that the first exception listed in the Open Meetings Act is "[t]he appointment, employment, compensation, discipline, performance, or dismissal of specific employees of the public body." 5 Ill. Comp. Stat. 120/2(c)(1). Accordingly, Defendants are correct that Tom's performance and other personnel matters were properly discussed in closed session.

In their Response, Plaintiffs assert that their "version of the facts shows that Defendants failed to specify when entering into closed session the exception relied upon" and establishes "that Defendants held closed session meetings into the wee hours of the morning when the public would be inconvenienced and failed to publicly close the meetings." However, Plaintiffs' "version of the facts" is supported by their sanctionable affidavits, which have been stricken.[19] This court agrees with Defendants that Plaintiffs' assertions, unsupported by the evidence, cannot create a genuine issue of material fact. This court further agrees that there is no provision in the Open Meetings Act related to public "inconvenience." In fact, Plaintiffs have provided no citation to any authority in support of their claims under the Open Meetings Act. For example, Plaintiffs have provided no authority to support Tom's belief that the Board was required to discuss his refusal to issue key cards to the members of the Board in open session. As noted previously, Plaintiffs have thereby forfeited the point. See Nuzzi, 2009 WL 1409703, at *6. Because Plaintiffs have not shown that

---

[19] This court notes that Hurst, in her affidavit, stated that she "personally witnessed and experienced violations of the Open Meetings Act by the St. George School Board." However, Hurst did not provide any dates or specifics to support this broad conclusion.

there is any basis for their Open Meetings Act claim, Defendants' request for summary judgment is granted.

## D. BREACH OF CONTRACT CLAIMS

In Count 10 of the Third Amended Complaint, Deborah claimed that St. George was liable for breach of contract. Deborah alleged that her "contract provided for payment July 10, 2007, for $8,827 for the month of June 2007 which she did not receive." Deborah further alleged that St. George breached her contract by denying her access to the school building, by failing to pay her for vacation days she earned, including 31 days for the 2008 school year, by denying her reimbursement for expenses under the contract for cell phone bills and other expenses, and by denying her renewal of her contract for the 2008-2009 school year. At her deposition, Deborah was questioned about these claims. Deborah testified that she was not claiming that she should have been paid $8,827 and that she thought there was "a typographical error in this Complaint." She then testified that she thought the "typo is that it should have said Thomas Nuzzi." Deborah testified that she had no documentation or calculations regarding her vacation days and that she "never would have had 31 vacation days" because that "was never in my contract." Deborah further testified that she "didn't have any cellphone bills" and "never presented them to St. George for reimbursement."

Defendants have argued that St. George is entitled to summary judgment on Deborah's claim of breach of contract. Defendants first argued that, based upon Deborah's deposition testimony, any claim for additional salary clearly fails. Defendants next argued that Deborah had not shown that her contract was breached in any way by the denial of access to the school building. Defendants again noted that security measures were reasonably put into place while Deborah was on leave and under the care of a psychiatrist. Defendants also argued that Deborah completely failed to show that

she was denied any vacation days or that she was denied reimbursement for any expenses.  Finally, Defendants noted that Deborah had no contractual right to have her one-year contract renewed and St. George followed the Illinois School Code in non-renewing her contract.

In Response, Plaintiffs stated that they "disputed" that Deborah testified that her claim for additional salary was a "typographical error."  Plaintiffs also argued, without elaboration, that Deborah's claim that she was denied access to the school was sufficient to show a breach of her contract.  Plaintiffs appeared to acknowledge that Deborah was not entitled to any reimbursement for expenses but argued that Deborah's testimony was sufficient to show that she was entitled to additional vacation days.  Plaintiffs also argued that Deborah was not given notice of the renewal of her contract according to the provisions of the School Code.  Plaintiffs appeared to agree with Defendants that she was entitled to notice 45 days before the end of the school year but then, without explanation, insisted that she was entitled to notice by April 1, 2008.

This court concludes that Plaintiffs' Response is so deficient that little discussion is necessary or warranted.  Again, there appears to be a disconnect between Plaintiffs' pleadings and deposition testimony which is somewhat belligerently unexplained.  This court specifically notes that Defendants are correct that a plaintiff's unsubstantiated statement that he or she is entitled to vacation pay is not sufficient to raise a genuine issue of material fact on that issue.  See Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 547 (7th Cir. 1998).  This is especially true here where Deborah's deposition testimony directly contradicted the allegations in the Third Amended Complaint.  This court additionally notes that it is clear that Deborah had no contractual right to the renewal of her contract.  See Crim, 147 F.3d at 547.  This court agrees with Defendants that Plaintiffs have not shown that there is a genuine issue of material fact as to any of Deborah's claims

of breach of contract. Accordingly, summary judgment will be entered in favor of St. George on this claim.

In Count 11, Plaintiffs alleged that St. George breached Tom's contract. They alleged that his contract was breached because he was not allowed access to his personnel file, because he was denied access to the school building, because he was not paid for all of his sick and vacation days, because he was "forced to take the direction of one or more individuals on the school board," because the Board did not give him goals, because he was not evaluated in a timely manner as required by his contract and because his contract was not renewed.

Defendants argued that St. George is entitled to summary judgment on all of Tom's claims. Defendants noted that Tom acknowledged during his deposition that his contract did not give him the right to view and copy his personnel file. Defendants further argued that Tom had no contractual right to access to the school building after he agreed to go on paid administrative leave. Defendants noted that Tom was told he had to make an appointment in order to be allowed into the school. Defendants further argued that it was reasonable to restrict Tom's access as a proper security measure. Defendants also argued that Tom did not provide any evidence to support his claim for vacation and sick time or his allegations that he was "forced" to perform improper actions by individuals on the Board. Defendants contended that Tom's contract contained two pages of goals and did not require the Board to provide him with additional goals. Defendants argued that Tom waived any breach of contract claim regarding the Board's failure to evaluate him prior to March 1 of each year because his evaluation was completed after that date every year of his employment and he continued to work for St. George pursuant to the contract. Defendants pointed out that each year Tom was evaluated after March 1 and each year he got a raise, accepted his raise, approved,

prepared, signed and cashed his own paychecks, signed two of his evaluations, failed to object to the timing of any of the evaluations and continued reporting to work. Defendants further argued that, even if not waived, Tom's claim regarding his evaluations fails because he suffered no damages. As far as Tom's claim regarding the non-renewal of his contract, Defendants argued that he had no contractual right to renewal and St. George scrupulously followed the procedure set out in the Illinois School Code when it did not renew his contract.

In their Response, Plaintiffs argued, with no citation to any pertinent authority, that St. George is liable for breach of contract because "Illinois requires that an employer allow an employee access to his personnel records under the Personnel Records Act." Plaintiffs also argued, with no elaboration, that St. George is liable for breach of contract for non-renewing Tom's contract because it did not "follow the federal constitution and federal laws against retaliation." Plaintiffs did not directly respond to Defendants' argument that Tom did not substantiate any claim for accrued vacation and sick time[20] and did not respond at all to Defendants' argument that Tom did not show that he suffered any damages based upon the failure to evaluate him prior to March 1 each year. Plaintiffs then made the astounding argument that Tom "is himself entitled to summary judgment based on Defendants' own admissions and the facts as presented by both Defendants and himself." Plaintiffs included in their Response a "Cross-Motion for Summary Judgment" as to Tom's breach of contract claims.

This court again concludes that Plaintiffs' Response is so deficient that little discussion is warranted. Obviously, Tom claimed breach of contract, not the violation of an Illinois statute or

---

[20] During his deposition, Tom could not provide any calculation regarding the number of vacation days he was claiming. In addition, he stated that he was "not going to doubt" Kolberg's figures.

federal law.  This court notes that, to the extent Tom is arguing he is entitled to recover based upon

the non-renewal of his contract, this court concludes that Tom had no contractual right to the

renewal of his contract.  See Crim, 147 F.3d at 547.  In addition, Tom does not even dispute that St.

George complied with the procedures set out in the Illinois School Code when it did not renew his

contract.  This court further notes that the evidence shows that St. George had numerous

performance-related reasons for the non-renewal of his contract.  This court agrees with Defendants

that there is no genuine issue of material fact and summary judgment must be entered on this claim.


### III.  PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

On August 24, 2009, Deborah filed a Motion for Partial Summary Judgment (#100) and

requested summary judgment in her favor as to her FMLA claim and her breach of contract claim.

Also, as noted, Tom has filed a "Cross-Motion for Summary Judgment" as to his breach of contract

claim.

Because this court has concluded that Defendants are entitled to summary judgment as to all

of Plaintiffs' claims, Plaintiffs' requests for summary judgment are DENIED.

### IV.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS

In their Amended Counterclaim, Defendants claimed that Tom and Deborah were liable for

breach of fiduciary duty, breach of contract and conversion.  In their Rule 56(a) Motion for

Summary Judgment, Defendants argued that the undisputed evidence shows that Deborah was

overpaid for the 2006-2007 school year, that Tom tried to hide this overpayment from the Board,

that both Plaintiffs submitted improper requests for reimbursement, that Tom submitted inaccurate

attendance figures to the ISBE for the 2005-2006 school year, leading to the ISBE's request for

reimbursement of $67,596, and that Plaintiffs retained possession of laptop computers and accompanying equipment which belongs to St. George. Defendants set out case law authority for their claims and asked this court to enter summary judgment in their favor.

In their Response, Plaintiffs have contested some of the facts set out by Defendants. However, they rely for the most part on their own affidavits, which have been stricken. In their bare-bones Memorandum of Law in Opposition to Defendants' Rule 56(a) Motion, Plaintiffs admitted that they owed a fiduciary duty to St. George. Plaintiffs argued that Defendants failed to show that they breached their fiduciary duties. Plaintiffs also argued that the facts do not show that Plaintiffs are liable for breach of contract. Plaintiffs argued that summary judgment cannot be entered on this record.

This court first concludes that Defendants have shown that Deborah was overpaid $5,202 for the 2006-2007 school year. The evidence shows that Deborah's gross earnings for that school year were $83,202 when her contract clearly provided that her salary was $78,000 and that any modification had to be in writing. At their depositions, both Tom and Deborah were given the opportunity to explain and justify Deborah's earnings for 2006-2007 school year. Deborah was not very knowledgeable about the amount she received for grants and the amount she received as transportation director. Tom testified that there was an oral modification to the contract, but was evasive regarding the amount over the $78,000 salary Deborah was supposed to receive. This court concludes that Plaintiffs' deposition testimony does not raise a genuine issue of material fact regarding whether Deborah was paid $5,202 more than her contract clearly stated she was entitled to receive. Because the record shows that Deborah received $5,202 more than she was entitled to for the 2006-2007 school year, Defendants have shown that Tom and Deborah are liable for breach

of their fiduciary duties and for breach of contract.

This court also concludes that the evidence shows that Tom and Deborah submitted improper requests for reimbursement and Tom submitted inaccurate attendance numbers to the ISBE. This court agrees with Defendants that these actions breached Tom and Deborah's fiduciary duties to St. George. This court concludes, however, that the evidence shows that Tom and Deborah did not actually receive double reimbursement for any expenses and Tom did not benefit personally from his reporting of inaccurate attendance numbers. While St. George has been told to reimburse the state for the excess funds it received for the 2005-2006 school year, Defendants have provided no authority which would support ordering Tom to pay the reimbursement amount. This court concludes that awarding damages in the amount of $5,202.00 is sufficient in this case.

This court also finds that Tom and Deborah retained possession of laptop computers and accompanying equipment owned by St. George. At his deposition, Tom admitted that he had possession of laptop computers belonging to St. George. This court therefore orders Tom and Deborah to return the laptops and related equipment to St. George within fourteen (14) days of the date of this Opinion.

For all of the reasons stated, Defendants' Rule 56(a) Motion for Summary Judgment (#128) is GRANTED. Judgment is entered in favor of Defendants and against Plaintiffs on Defendants' Amended Counterclaim. Plaintiffs are ordered to pay Defendants $5,202.00 and are also ordered to return the laptop computers and computer equipment owned by St. George to Defendants.

## MOTION FOR SANCTIONS

On September 18, 2009, Defendants filed a Motion for Rule 11 Sanctions (#110). Defendants set out numerous deficiencies in Deborah's Motion for Partial Summary Judgment

46

(#100) and argued that this court should grant their Motion for Rule 11 Sanctions and award them the attorney's fees they incurred in responding to Deborah's Motion.

This court notes that, in ruling on Defendants' Motion to Strike (#104), it has already noted some of the deficiencies in Deborah's Motion for Partial Summary Judgment. Defendants' Motion for Sanctions presents a very close question, and this court concludes that sanctions could certainly be justified in this case. However, because this court has stricken Deborah's affidavit in support of her motion and denied her motion, it declines to award additional sanctions. This court notes that, as the prevailing party, Defendants are certainly entitled to recover their costs, including the costs incurred in obtaining deposition transcripts, under Rule 54(d) of the Federal Rules of Civil Procedure.

## MOTION FOR JUDGMENT AS A MATTER OF LAW

Before Plaintiffs filed their late Response to Defendants' Rule 56(b) Motion for Summary Judgment, Defendants filed a Motion for Judgment as a Matter of Law (#135). Defendants asked this court to enter judgment in their favor due to Plaintiffs' failure to respond. This court has, however, allowed Plaintiffs to file their response and has entered judgment in Defendants' favor after careful consideration of the evidence presented in this case. Therefore, Defendants' Motion for Judgment as a Matter of Law (#135) is MOOT. This court also finds Defendants' Motion for Leave to File (#157) to be MOOT.

IT IS THEREFORE ORDERED THAT:

(1) Deborah's Motion for Partial Summary Judgment (#100) is DENIED.

(2) Defendants' Motion to Strike (#104) is DENIED.

(3) Defendants' Motion to Strike (#106) is GRANTED. The deposition of Deborah Nuzzi filed in support of her Motion for Partial Summary Judgment is STRICKEN.

(4) Defendants' Motion for Sanctions (#110) is DENIED.

(5) Defendants' Rule 56(b) Motion for Summary Judgment (#116) on Plaintiffs' claims is GRANTED. Judgment is entered in favor of Defendants and against Plaintiffs on all remaining claims in Plaintiffs' Third Amended Complaint.

(6) Defendants' Rule 56(a) Motion for Summary Judgment (#128) on their Amended Counterclaim against Plaintiffs is GRANTED. Judgment is entered in favor of Defendants and against Plaintiffs on Defendants' Amended Counterclaim. Plaintiffs are ordered to pay damages to St. George in the total amount of $5,202.00 and are also ordered to return the laptops and related equipment in their possession to Defendant St. George within fourteen (14) days of this Opinion.

(7) Defendants' Motion for Judgment as a Matter of Law (#135) and Motion for Leave to File (#157) are MOOT.

(8) Plaintiffs' Motion for Leave to File (#137) and Motion for an Extension of Time to File (#145) are GRANTED.

(9) Defendants' Motion to Strike and for Sanctions (#161) is GRANTED. The affidavits of Tom and Deborah Nuzzi submitted in opposition to Defendants' Motions for Summary Judgment are STRICKEN. Defendants are allowed 30 days to submit an affidavit documenting the attorney's fees and costs Defendants incurred in responding to Plaintiffs' sanctionable affidavits. Plaintiffs will have 14 days to file objections to Defendants' request for attorney's fees and costs.

(10) Plaintiffs' Motion for Leave to File (#171) is GRANTED

(11) This case is terminated.

ENTERED this 23rd day of February, 2010

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE